UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIUS AND PHYLLIS WALTZER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALKERMES, INC., RICHARD F. POPS, ROBERT A. BREYER, DAVID A. BROECKER, MICHAEL J. LANDINE, JAMES M. FRATES and JAMES L. WRIGHT<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiffs Julius and Phyllis Waltzer, on behalf of themselves and all other persons similarly situated, by plaintiffs' undersigned attorneys, for plaintiffs' Complaint, alleges upon the investigation made by and through plaintiffs' counsel, which included, *inter alia*, a review of relevant public filings made by Alkermes, Inc. ("Alkermes" or the "Company") with the Securities and Exchange Commission, as well as, tele-conferences, press releases, news articles, analyst reports, and media reports concerning the Company. This complaint is based upon plaintiffs' personal knowledge as to plaintiffs' own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## SUMMARY OF ACTION

1.  This is a class action on behalf of all persons, other than defendants, who purchased Alkermes common stock during the period from April 22, 1999, and July 1, 2002, inclusive (the "Class Period") to recover damages caused by defendants' violations of the federal securities law.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts and practices complained of herein occurred in substantial part in this District and Alkermes maintains its corporate headquarters in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiffs Julius and Phyllis Waltzer purchased shares of Alkermes common stock as set forth more fully in the annexed certificate and suffered economic damages.

7. Alkermes is headquartered at 88 Sidney Street, Cambridge, Massachusetts. Alkermes is an emerging pharmaceutical company developing products based on applying its proprietary drug delivery technologies. The Company's areas of focus include controlled, extended-release of injectable drugs using its ProLease and Medisorb delivery systems and the development of inhaled pharmaceuticals based on its proprietary Advanced Inhalation Research, Inc. (AIR) pulmonary delivery system. Alkermes partners its proprietary technology systems and drug delivery expertise with several pharmaceutical companies and it also develops novel, proprietary drug candidates for its own account.

8.  The defendants listed below served, during the period specified, as senior officers and/or directors of Alkermes:

(a)  Defendant Richard F. Pops ("Pops") was Chairman and CEO of Alkermes. During the Class Period, Pops sold 663,312 of his Alkermes shares, for net proceeds of $20.3 million.

(b)  Defendant Robert A. Breyer ("Breyer") was President of Alkermes until December 2001 and is a director of the Company. During the Class Period, Breyer sold 522,375 of his Alkermes shares, for net proceeds of $14.7 million.

(c)  Defendant David A. Broecker ("Broecker") was Chief Operating Officer of Alkermes.

(d)  Defendant Michael J. Landine ("Landine") was Vice President of Corporate Development and a former CFO of Alkermes. During the Class Period, Landine sold 183,500 of his Alkermes shares, for net proceeds of $5.4 million.

(e)  Defendant James M. Frates ("Frates") was Vice President, Chief Financial Officer and Treasurer of Alkermes. Defendant Frates managed Finance, Intellectual Property, Investor Relations and Human Resources. In addition, he oversaw the pending acquisition of Reliant Pharmaceuticals, as well as Alkermes' $200 million convertible bond issue. During the Class Period, Frates sold 86,000 of his Alkermes shares, for net proceeds of $2.8 million.

(f)  Defendant James L. Wright ("Wright") was Senior Vice President, Research and Development of Alkermes. During the Class Period, Wright sold 5,000 of his Alkermes shares, for net proceeds of $164,000.

9. Pops, Breyer, Broecker, Landine, Frates and Wright are sometimes referred to herein as the "Individual Defendants." Because of the Individual Defendants' positions with the Company, the Individual Defendants had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Alkermes, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Alkermes, each of the defendants had access to the adverse undisclosed information about Alkermes' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Alkermes and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the

Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Alkermes securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Alkermes' business, operations, management and the intrinsic value of Alkermes common stock; and (ii) caused plaintiffs and other members of the Class to purchase Alkermes securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

15. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the common stock of Alkermes during the Class Period and who suffered damages (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

16. The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's report filed on Form 10-Q with the SEC on August 14, 2002, for the period ended June 30, 2002, which is near the end of the Class Period, Alkermes had approximately 64.5 million shares of common stock outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believes that there are hundreds or thousands of

6

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alkermes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of Alkermes; and

(c) whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d) whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Fraudulent Scheme and Course of Business

21. Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about Alkermes. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Alkermes common stock was a success, as it (i) deceived the investing public regarding Alkermes' prospects and business; (ii) artificially inflated the prices of Alkermes' common stock; (iii) allowed defendants to sell $200 million worth of Alkermes securities at artificially inflated prices; (iv) allowed Alkermes to enter into an agreement to complete its acquisition of Reliant Pharmaceuticals using Alkermes shares at artificially inflated prices; (v) allowed several defendants to sell their own shares at artificially inflated prices for insider trading proceeds of over $43 million; and (vi) caused plaintiffs and other members of the Class to purchase Alkermes common stock at inflated prices

22. Alkermes is a biopharmaceutical company focused on the development of controlled release drug delivery technologies and their application to existing or new drug therapies. The Company's NDA for Risperdal Consta (depot product, depot formulation) for the

treatment of schizophrenia has been filed at the FDA. Risperdal (Risperidone) belongs to a class of compounds referred to as atypical antipsychotics, used in the treatment of schizophrenia. If approved by the FDA, Risperdal Consta would represent the first example of a sustained release or "depot" formulation for biweekly administration, to mitigate patient compliance issues.

23.     The Risperdal Consta development effort is the result of a partnership between Medisorb Technologies International L.P. ("MTI") and Janssen. MTI entered into a development agreement with Janssen on or about December 23, 1993. Alkermes acquired the Risperdal Consta development program through the acquisition of MTI by its Alkermes Controlled Therapeutics Inc. II ("ACT II") subsidiary in 1996. The original development agreement was followed by two licensing agreements signed on or about February 21, 1996. The original development agreement was then amended on or about March 8, 1997 ("Second Amendment"). A definitive Manufacturing and Supply Agreement ("Mfg. Agreement") for a depot formulation of Risperidone was established on or about August 6, 1997. Other amendments and agreements occurred between the parties during the Class Period.

24.     Within the Mfg. Agreement of 1997 are certain terms between the parties to address the responsibilities of the parties, including forecasting for the development and commercial production of Risperidone a "Manufacturing Readiness Plan" by which Alkermes would commit such resources and undertake such maintenance and training programs as needed to keep ACT II manufacturing facilities in a state of readiness for commercial manufacture of Risperidone. The 1997 Mfg. Agreement also covers quality and regulatory considerations, including the preparation and filing of a facilities Drug Master File ("DMF") with respect to the facilities where ACT II would manufacture the product and polymers.

25. The submission of a DMF is not required by law. A DMF is sometimes submitted to the FDA as a tool to protect confidential and detailed information about facilities, processes, or articles used in the manufacturing, processing, purchasing, and storing of drug products. DMFs allow a party other than the DMF holder to reference materials without disclosing to that party the contents of the file. The result is the maintenance of the confidentiality of the contents to the DMF holder. The FDA will typically not review the substantive elements of the DMF until it is ready to review the IND, NDA or other application referencing the DMF.

26. Schizophrenia is a chronic, severe and disabling brain disease. Deterioration of brain matter can sometimes be detected or measured, and is particularly profound in children with early onset of the disease, affecting verbal memory, attention, reasoning, aggression and meaningful speech. According to the National Institute of Mental Health, approximately 1% of the world population suffers from schizophrenia in any given year. This suggests that as many as 2 million people in the United States are affected. Schizophrenia can be difficult to diagnose, but is usually manifested in a variety of so-called positive and negative symptoms. Positive symptoms are usually manifested as hallucinations or delusions that distort a person's sense of reality, often leading to paranoia. Negative symptoms are usually manifested as forms of isolation or withdrawal accompanied by poor personal hygiene or general lack of motivation. Combinations of positive and negative symptoms are possible, resulting in a diagnosis of manic or bipolar disorders.

27. The goal of a successful drug to treat schizophrenia is to inhibit and eliminate the mental, emotional, and behavioral disturbances associated with the disorder, with minimal side effects. Risperidone (Risperdal, 3-[2-[4-(6-Fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl] -6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one) is a so-called "atypical"

antipsychotic, a term reserved for the subclass of drugs having prominent antiserotonergic, as well as, antidopaminergic (D2) and antihistaminic (H1) activities.

28. Risperdal Consta is a white powder made from Risperidone and 7525 DL JN1 poly-(d,l-lactide-co-glycolide) Medisorb polymer. The designation 7525 means that the polymer is composed of lactide (A) and glycolide (B) units in a 75/25 ratio, in a random (unknown) sequence of "A" and "B" units. Polymers composed exclusively of A or B units have much slower rates of hydrolysis than polymers composed of mixtures of A and B units. Risperdal Consta is made by a combination of patented and proprietary processes that dissolve the Medisorb polymer, mix into it the Risperidone drug, and finally precipitate the polymer in the form of "microspheres." The microspheres are formed and processed in a sterile environment, whereby a known amount of powder is deposited in clean sterile vials. Critical to the process are methods to obtain the proper particle size of the microspheres and the uniform distribution of the drug in the polymer. Biweekly depot dosage forms currently available ex-U.S. include 25 mg, 37.5 mg and 50 mg. The 25 mg dosage form appears to be equivalent to a 2 mg oral dose.

29. According to ex-U.S. consumer information for the drug, Risperdal Consta is to be stored and used in the following manner: First, vials containing Risperdal Consta should be refrigerated at all times prior to use. To administer Risperdal Consta, the powder is diluted with an aqueous injection vehicle using a needle and syringe. The contents of the vial are shaken until a suspension is formed, appearing thick and milky in color. The entire contents of the vial is withdrawn, an appropriate needle is employed, air bubbles removed and, by application of proper technique, the entire contents of the syringe are injected intramuscularly into the buttock of the patient.

30.  The release of Risperdal from the Risperdal Consta drug product may be described by an "in vivo release profile," the manner by which the drug entrapped in the Medisorb polymer matrix is released once the microspheres have been injected into the patient. For example, if the release profile demonstrates a "burst effect," releasing too much of the drug into the patient within a 24-hour period, the patient might experience an extremely high dose of the drug, followed by a lower linear release over time. Alternatively, the release profile could be sigmoidal in nature, characterized by an initial lag in the release of the drug from the Medisorb polymer matrix, followed by a steep intermediate release phase, and ending in a flat final release phase. The defendants have a patented technology that they may employ to control the in vivo release profile.

**Safety of Risperdal Consta**

31.  The degree to which advantages with sustained or extended release drug formulations are realized is determined in part by safety considerations, including the ability to discontinue patient treatment when serious drug-related side effects are observed or when other critical medications capable of drug-drug interactions must be administered.

32.  Alkermes reassured investors by explaining the advantages of and experience it has with its ProLease and Medisorb sustained-release drug delivery technologies on its Web site:

<u>ProLease® and Medisorb® Injectable Sustained-Release Drug Delivery Systems</u>

Alkermes® has developed two uniquely complementary platforms for drug delivery: ProLease and Medisorb injectable sustained-release technologies for both small and macromolecules. With release profiles lasting from days to months, each is designed to eliminate the need for frequent dosing. Each has the potential to:
· Improve patient compliance and convenience by reducing dosing frequency

- Improve safety and tolerability

- Reduce adverse effects associated with peak/trough levels of other (oral) dosage forms

- Commercialize products that would otherwise not be viable because of delivery or economic considerations

- Optimize product lifecycle management

The advantages are clear.

Each technology supports a broad array of applications and offers customizable release profiles lasting from days to months.

Alkermes has refined outstanding expertise in the kinetics of controlled release by generating predictable in vivo performances and clinically proven formulations.

With established commercial manufacturing facilities and all encompassing development infrastructure, Alkermes solidifies its position as a market leader in injectable sustained-release.

Alkermes' commitment to innovation brings product concepts to realization.

33. When the oral dosage form can cease to be administered or the dosage unit can be readily removed from the patient, as in the case of a transdermal patch, safety issues can be more readily addressed. When the formulation is designed as an implanted biweekly sustained-release dosage form, utilizing Medisorb polymer for sustained release of Risperdal, a drug known to defendants as having significant and serious side effects, potentially life-threatening safety issues could result from defendants' product design.

## FALSE AND MISLEADING STATEMENTS DURING CLASS PERIOD

34. On April 22, 1999, the Company issued a press release which stated in pertinent part:

> Alkermes and Janssen Pharmaceutica to Proceed into Phase III Clinical Trials of Sustained Release Formulation of Anti-Psychotic Drug Risperdal®
>
> Cambridge, MA -- Alkermes, Inc. (NASDAQ: ALKS) announced today that Janssen Research Foundation, a division of Janssen Pharmaceutica, will proceed into Phase III clinical trials of an IM injectable sustained release formulation of the anti-psychotic drug expected commercial scale. RISPERDAL® (risperidone). The product candidate is based on Alkermes' Medisorb® drug delivery system and is designed to provide patients with prolonged therapeutic benefit from a single administration. The decision to proceed into Phase III clinical trials follows the successful completion by Janssen of Phase I and Phase II clinical trials of the product candidate and the completion by Alkermes of scale-up and Phase III manufacturing activities at the expected commercial scale.
>
> "This is an important milestone in the development of this product candidate and of our Medisorb drug delivery technology," said Richard F. Pops, Chief Executive Officer of Alkermes. "We have moved rapidly in the development and scale-up of this product candidate with our partners at Janssen Pharmaceutica. We look forward to the next phase of product development."

35. Defendants concealed the fact that the Medisorb facilities were comprised of two parts: the research and development operations in the "Blue Ash" facility located at 6954 Cornell Road in Cincinnati, Ohio, and the manufacturing facilities located approximately 35 miles north on Olinger Circle in Wilmington, Ohio.

36. While defendant Pops announced the production of manufacturing lots at commercial scale, the defendants concealed that the Wilmington facility was wholly unable to commence or maintain commercial scale operations for cGMP manufacture of Risperdal Consta or any other drug product. As of the April 22, 1999 press release, the only DMF in existence, established on March 15, 1990, was for the manufacture of Medisorb polymer at the Blue Ash facility in Cincinnati, Ohio. No such document had ever been filed for the Wilmington, Ohio facilities for the production of Medisorb injectable sustained-release drug delivery systems. Nor

have defendants ever sustained a successful FDA pre-approval inspection in connection with the manufacture of any commercial drug products based on Medisorb sustained-release technology or in the Wilmington facilities.

37.   Defendants also concealed quality issues with the 7525 DL JN1 poly-(d,l-lactide-co-glycolide) Medisorb polymer used in the production of Risperdal Consta manufacturing lots. Defendants knew that a uniform process of manufacture of polymer, achieving control over important quality parameters such as molecular weight, was critical. The decision not to routinely conduct tests for molecular weight on its Medisorb cGMP polymer lots concealed the fact that Medisorb polymer production methods resulted in molecular weights with an unacceptably wide variation from lot to lot for use in production of sustained-release drug delivery systems. Defendants knew at all times during the Class Period that: (i) polymer molecular weight affects drug release characteristics; (ii) the molecular weight of a polymer influences the biodegradation rate of the polymer; and (iii) polymer lot-to-lot variations can influence the in vitro and in vivo release profiles of the drug within a polymer matrix. In addition to the deficient state of the Wilmington manufacturing facilities, the April 22, 1999 press release failed to disclose the inadequate nature of the manufacturing process and controls for cGMP manufacture of Medisorb polymer lots that substantially contributed to the quality issues in the manufacture of Risperdal Consta research and clinical supplies during the Class Period.

38.   In January 2000, defendant Breyer sold 200,000 Alkermes shares, defendant Frates sold 8,000 Alkermes shares, defendant Landine sold 99,000 Alkermes shares and defendant Pops sold 350,000 Alkermes shares at prices between $24.50 and $25.50 per share.

39.   On February 16, 2000, the Company issued a press release which stated in pertinent part:

> Alkermes Announces Placement of $200 Million in Convertible Subordinated Notes
>
> Alkermes (NASDAQ: ALKS) today announced the private placement of $200 million aggregate principal amount of its 3¾% Convertible Subordinated Notes due 2007. The offering, which was made through initial purchasers to qualified institutional buyers under Rule 144A under the Securities Act of 1933, is expected to close on February 18, 2000. Alkermes has also granted the initial purchasers of the notes an option to purchase up to an additional $50 million in principal amount of the notes. The notes are convertible into common stock of Alkermes at a conversion price of $135.50 per share, subject to adjustment in certain circumstances. Alkermes has agreed to file a registration statement for the resale of the notes and the common stock issuable upon conversion of the notes within 60 days after the closing of the offering.

40.    News of the success of this badly-needed financing reassured investors that the Company's products were viable and that the investment banking community stood behind the Company's science. Most importantly, as a result of this financial announcement, defendants convinced investors that the Company's success was assured, as shares spiked nearly 90% in value in the days that followed the announcement.

41.    On May 19, 2000, defendants filed Application Ser. No. 09,575,075 with the U.S. Patent and Trademark Office for the grant of a patent entitled, "Method for Preparing Microparticles Having a Selected Polymer Molecular Weight." Among the details describing the preferred embodiments of the invention was the following statement explaining the key use of the method:

> The methods of the present invention control the hold time and temperature of a polymer solution in order to control the molecular weight of the polymer in the finished microparticle product. In this manner, the methods of the present invention advantageously allow a selected polymer molecular weight to be achieved from a variety of starting material molecular weights. Alternatively, microparticle products of varying polymer molecular weights can be produced using the same molecular weight starting material. Thus, a range of products can be made from the same starting materials, thereby eliminating the need to reformulate the finished product to achieve the desired molecular weight of the polymer in the finished product.

42. By seeking the approval of the patent application made on May 19, 2000, defendants sought to demonstrate expertise in the field and the capacity to create valuable intellectual property, while concealing a desperate need to identify product manufacturing methods to "fix" the quality issues relating to wide variations in the quality of Medisorb polymer required for the manufacture of Risperdal Consta.

43. Defendants knew that Medisorb PLGA polymers are actually composed of random (unknown) sequences of lactide (A) and glycolide (B) units, resulting in polymer strand regions with interspersed block (AB... AA... or BB...) sequences of unknown length. Defendants knew that degradation rates of PLGA polymers in solution have markedly different degradation rates, on the order of weeks or months, depending on the lactide/glycolide ratio, a fact critical to the polymer selection process and to the performance of a Medisorb sustained release PLGA based drug delivery system in vivo. Yet, despite defendants' knowledge of the critical nature of the lactide/glycolide ratio on the performance of Medisorb technology, defendants concealed the impact of the erosion process in the May 19, 2000 patent application, when applied to 75/25 Medisorb PLGA polymer having molecular weights ranging from 92 to 230 kiloDaltons (kD), on the lactide/glycolide ratio.

44. Defendants' use of a manufacturing scheme that included either or both of patented methods, first to "erode" or "degrade" the Medisorb polymer in an organic solution of the polymer containing Risperdal, and secondly to control the "burst effect," would further complicate defendants' efforts to achieve a cGMP compliant Risperdal Consta manufacturing process. The reason defendants sought new patented and proprietary processes that would actually complicate the Risperdal Consta manufacturing process was so that they could continue their concealment of quality issues relating to variation in the manufacturing process for the

Medisorb polymer. Defendants sought these complications even though they realized that they would create significant obstacles in achieving a controlled manufacturing process capable of validation, a key requirement for FDA inspection activities necessary to demonstrate readiness for manufacture of the product in the Wilmington facility.

45. In July 2000, defendant Breyer sold 75,000 Alkermes shares, defendant Frates sold 30,000 Alkermes shares, defendant Landine sold 40,000 Alkermes shares and defendant Pops sold 175,000 Alkermes shares at prices between $44.09 and $45.61 per share.

46. In September 2000, defendants' joint venture partner Janssen caused to be published a Review Article entitled, "A Risk-Benefit Assessment of Risperidone for the Treatment of Behavioural and Psychological Symptoms in Dementia" ("Risk Assessment"). The article signaled the acceptability of the safety and efficacy profile of the drug for the treatment of dementia in the elderly. While the article was intended to disclose serious Risperdal side effects as part of a risk-benefit assessment, it actually concealed serious adverse cerebrovascular side effects ("CVAEs") in the elderly, contained in one or more Janssen studies cited as references to the article.

47. From January 2001 through July 2001, defendant Breyer sold 135, 000 Alkermes shares, defendant Frates sold 20,000 Alkermes shares, defendant Landine sold 18,000 Alkermes shares, defendant Pops sold 55,000 Alkermes shares and defendant Wright sold 5,000 Alkermes shares at prices between $22.00 and $34.65 per share.

48. On or about August 1, 2001, defendants executed an Addendum to the Mfg. Agreement of 1997 ("Wilmington Facility Agreement"). The intent of this agreement was to recognize and remedy the fact that the Wilmington manufacturing facilities for the Risperdal