The new study, scientists said, is important because of its careful methodology and substantial size: the researchers based their analyses on medical records from 19,878 veterans treated with an older or newer drug between October 1998 and October 2001.

Of 5,981 veterans who took Zyprexa, 200, or 3.34 percent, developed diabetes, compared with 170, or 2.43 percent, of 7,009 veterans taking Haldol or another older medication. Of 5,901 patients taking Risperdal, 193, or 3.27 percent, developed diabetes; 21, or 2.39 percent, of 877 veterans taking Seroquel developed the illness. All three drugs raised a patient's chances of developing the illness by about 50 percent, but the meaning of the increased risk among patients taking Seroquel was unclear because of the smaller number of subjects who took the drug, the researchers said.

"We need a larger number of observations to be certain what its risk is and whether it differs from other drugs," said Bruce Lambert, an associate professor of pharmacy administration at the University of Illinois at Chicago and an author of the study.

The study was financed in part by Bristol Myers Squibb, the maker of Abilify, an atypical that had not entered the market when the study began and has not been systematically studied for a link to diabetes.

* * *

Laura Bradbard, a spokeswoman for the F.D.A., which has been tracking the diabetes issue, said the agency was reviewing the new findings, which were presented yesterday in Philadelphia at a meeting of the International Society for Pharmacoepidemiology ....

The agency is considering whether to add or strengthen warnings in the labeling of certain drugs or on the class of drugs as a whole.

How atypical antipsychotics might produce or uncover diabetes is unknown. Weight gain, a side effect of some drugs, may play a significant role, researchers believe. But P. Murali Doraiswamy, chief of the division of biological psychiatry at Duke University, said that in some cases the illness has come on rapidly, before patients have time to gain weight.

80.     Despite earlier public assurances that Risperdal was found to be an exception to the increased risk of diabetes posed by certain atypical antipsychotics, defendants sought to conceal the serious negative impact on the market for and approvability of Risperdal Consta that would inevitably follow a link to diabetes.

81. Defendants' revenue projections for Risperdal Consta were grossly inflated

82. The true facts, which were known by each of the defendants during the Class Period but were concealed from the investing public, were as follows:

(a) In an attempt to decrease development expenses and speed the product to market, defendants concealed the deficient nature of the manufacturing process for Medisorb PLGA polymer used to manufacture Risperdal Consta, resulting in quality management issues and delays in the development program.

(b) In order to conceal lot-to-lot variations resulting from the manufacturing process for Medisorb polymer manufacture, defendants minimized process development and validation requirements, including the establishment of specifications and analytical tests necessary to control those variations.

(c) Significant quality issues for the manufacture of Risperdal Consta existed at the Wilmington, Ohio facilities, impacting the ability of the Company to meet clinical development timelines for Risperdal Consta.

(d) In order to avoid disclosure of the serious deficiencies of the Medisorb manufacturing process, particularly the lot-to-lot variation in molecular weight for Medisorb polymer, and in order to find a way to fix the desired molecular weight of the Risperdal Consta finished drug product, defendants patented a method to degrade the finished product to the desired molecular weight based on defendants' concealment of the fact that Risperdal's adverse effects and safety or tolerability issues are worsened when Risperdal is formulated using Medisorb technology and used as intended.

(e) Defendants concealed the combined effect of the financial agreements reached with its joint venture partner, Janssen, that Risperdal Consta would not be profitable

unless it achieved the high end of sales projections, an unlikely outcome because of the worsening of Risperdal's adverse effects and safety or tolerability issues when the drug was formulated using Medisorb technology and used as intended.

(f) The serious safety concerns for Risperdal "oral" and Risperdal Consta "depot" products, such as CVAEs in elderly patients, extrapyramidal symptoms, QT interval prolongation and diabetes, which were detected in clinical trials that went unreported to worldwide regulatory authorities for long periods, in some cases for studies completed well before the beginning of the Class Period, were negatively impacting the regulatory review process.

(g) For one or more reasons related to the known but unmet manufacturing, safety or efficacy requirements for the drug, the NDA for Risperdal Consta would not be approved on July 1, 2002.

(h) The failure to disclose the defective nature of the Risperdal Consta chemical and manufacturing controls, clinical program, safety and other issues preventing the Company from realizing product approval would prevent investors from learning the extent of the misrepresentations made to them during the Class Period.

## SCIENTER

83. In addition to the above-described involvement, each Individual Defendant had knowledge of Alkermes' problems and was motivated to conceal such problems. Landine, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing Alkermes' forecasted and actual growth were prepared by the finance department under Landine's direction. Defendant Pops, as CEO and Chairman, was responsible for press releases issued by the Company. Wright, as Vice President of Research and

Development, was responsible for development and manufacturing readiness. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

84. At all relevant times, the market for Alkermes securities was an efficient market for the following reasons, among others:

(a) Alkermes stock met the requirements for listing, and was listed and actively traded on the Nasdaq National Market ("Nasdaq"), a highly efficient and automated market;

(b) As a regulated issuer, Alkermes filed periodic public reports with the SEC and the Nasdaq;

(c) Alkermes regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Alkermes was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

85. As a result of the foregoing, the market for Alkermes' securities promptly digested current information regarding Alkermes from all publicly available sources and reflected such information in Alkermes' stock price. Under these circumstances, all purchasers of

Alkermes securities during the Class Period suffered similar injury through their purchase of Alkermes securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

86. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Alkermes who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

87. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

88. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase Alkermes securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

89. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alkermes securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Alkermes as specified herein.

91. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alkermes' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Alkermes and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of Alkermes securities during the Class Period.

92. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Alkermes operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

42

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Alkermes securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of Alkermes' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Alkermes securities during the Class Period at artificially high prices and were damaged thereby.

95. At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the true financial position, operating conditions and expenses that Alkermes was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Alkermes securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

97. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

98. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

99. The Individual Defendants acted as controlling persons of Alkermes within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

44

101. As set forth above, Alkermes and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiff and certifying plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 17, 2003

**SHAPIRO HABER & URMY LLP**

Respectfully submitted,

By: _____
Edward F. Haber, Esq. (BBO #215620)
Theodore M. Hess-Mahan, Esq. (BBO #557109)
75 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134


**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ, LLP**
Lawrence P. Kolker, Esq.
Christopher S. Hinton, Esq.
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653


**HANZMAN & CRIDEN, P.A.**
Michael E. Criden
Commercebank Building
220 Alhambra Circle, Suite 400
Coral Gables, Florida 33134
Telephone: (305) 357-9000
Fax: (305) 357-9050

339408

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

We, Julius Waltzer and Phyllis Waltzer hereby certify that the following is true and correct to the best of our knowledge, information and belief:

1. We have reviewed the complaint filed herewith in the captioned action (the "Complaint"), and have authorized the filing thereof.

2. We are willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

3. We purchased 43 shares of the common stock of Alkermes on January 30, 2002 at 25.21 per share.

4. We did not purchase these securities at the direction of my counsel, or in order to participate in any private action arising under the Securities Exchange Act of 1934.

5. During the three year period preceding the date of our signing the Certification, we have not served as a representative in any action arising under the Securities Exchange Act of 1934.

6. We will not accept any payment for serving as a representative party on behalf of the Class beyond our pro rata of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to our representation of the Class.

Signed under the penalties of perjury this ___ day of November, 2003.

_____
JULIUS WALTZER

_____
PHYLLIS WALTZER